This case was tried, and it was tried on essentially, and I use that term inadvertently, on essential functions. It started with essential functions way back in discovery. It was dealt with heavily in the three pre-trial conferences on what were the essential functions and who had the burden of proof on essential functions. And during the trial of the case, the question of essential functions was primarily the topic that was addressed along with accommodations then. The question of who had the burden of proof was also addressed in the pre-trial conferences. And in one, in fact, in the early pre-trial conferences, both the defendant and the judge said defense has the burden of establishing the pre-trial conferences, I'm sorry, has the burden of establishing what are the essential functions. By the time we got to the last pre-trial conference in the middle of trial, that had reversed, and the court was saying at that point, no, the plaintiff has to have the burden of establishing the essential functions. So as we went into the trial of this case, the question of what were the essential functions was the central focus, and we were in a... By that time, the judge had told you, you're going to have to prove that the plaintiff was a qualified individual. Qualified individual and going on to perform the essential functions, that's right. By the time you stood up to give your opening statement, you knew the burden was on the plaintiff. At that point, we knew. At that point, we couldn't do much about it. We tried through discovery to get something from the defendants that we could use to identify essential functions. All they had was a list that talks about responsibilities. Let me talk to you about how I'm seeing the case so that you can educate me about my errors. It looks to me as though you've got a lengthy and thorough trial that focused, as you say, on basically whether a paraplegic could do the job of head operator or whether a head operator really needed to be prepared to run outside and run up ladders. That was a trial. Testimony came in on both sides. Although the burden was on plaintiff, it was a preponderance of evidence standard, which means the burden matters a whole lot less than, say, in a criminal case or a clear and convincing standard case. You don't win a preponderance case on burden of proof unless there's an absence of evidence on one side ordinarily. I'm thinking, number one, it didn't matter. Number two, you've got an extended trial on it. And number three, I think this is not a company-wide standard. This is an individual judgment. And the plaintiff does have to prove he's qualified to do the job, whatever the job happens to be. What am I missing here? Well, if you go back to the cases, we know that we have Bates, and Bates refers back to, and added... You've got two problems that I see. One is, it's not final yet. The mandate hasn't come down yet. There may be an en banc on it. And number two, that's a company-wide standard. It's not an individualized judgment. Company-wide standard, no UPS truck drivers who are deaf and one or both ears. This is an individualized judgment about tank operators. They've got a paraplegic tank operator in Alaska. It's okay, but this particular tank farm, not okay with the company. So I don't see where Bates really does the job for you. Well, two points here. Number one, there was no individualized assessment in this case at all. From the moment that they went to the hospital, within three days, I think it was, after he broke his back, John Sherman, the terminal manager, said, you're not coming back. There was no individualized assessment at all. They went through this, what, a sham of an interactive process. Is there some published company standard? Well, I just, no, there isn't any published company standard. So that's the second point. Let's go back to Manette's. Is there some published company standard? I'm not sure what you're asking on that one. I think you and I are using the word individualized in different ways. You're using it as, did they make enough, sufficiently searching inquiry, and I'm using it to mean, are they talking about this man and this job, or is it a kind of Procrustean bed that everybody in the company is put into? Well, it's not the case where there is a standard that says anybody who's paraplegic cannot work in our company. And I think that's what the Bates situation, redistinguishing that. But the second part of the answer was, go back to Manette in the Sixth Circuit, where Bates is relying on, and that was a thorough examination of the various burdens of proof in different stages. And the key there is that there's only one party who really has the ability to identify essential functions, and that's the employer. The individual who's trying to get this job back and is trying to go to the company and say, tell me what I need to do. Mr. Kramer went back multiple times and said, I want to come back to work. I thought that the jury could very easily have said, on this record, we don't believe the employer. We think they just don't like this guy. There really is no need for a head on the ladders. And the evidence was there. The jury could have bought it. They also could buy the proposition, no, head operator has to be ready to run outside, deal with emergencies, run up a ladder if the guy who's supposed to run up the ladder didn't show up for work. We could have an Exxon Valdez here if we have a guy on the job that we should have fired. But that's the problem. We had, as a plaintiff, had to go in there and defend against or deal with accommodations for anything they wanted to say because they didn't have the burden of establishing essential functions. And they did, in fact, say virtually everything. And they used phrases like head operators had to and were required to. And what they were doing was they were talking about all the things that head operators did, whether it was because they had to, it was because they wanted to. There's testimony that some people did some things just because they wanted to get out and stretch their legs, so to speak. Mr. Crispin, did the employer put on evidence that it was necessary that they have these 12-hour shifts? Let's take that as the first point. Was there evidence that the employer said, yeah, we've got to have the 12-hour shifts. You just can't run this company without them. Did that come out? Well, there was testimony that they claimed that 12-hour shifts was something they needed to do. There was also testimony that there was an easy way to deal with it, that their concerns were and what was behind this 12-hour shift idea. Suppose you have that, then. You have testimony, we've got to have 12 hours. Now, on the other hand, you have a plaintiff who says, no, you don't need 12 hours. You can do it in 8-hour shifts, and this is the way you can accommodate that, and it would work just fine. So the 12-hour is not a necessary aspect of the job. Now, if neither party has the burden, I don't know what a jury might do with tying evidence that you've built, competing evidence that's on a level playing. You would say, well, who's got the burden of proof? And then you would decide against the person who had the burden of proof, I think. Now, if that's what Bates is talking about, that's something you didn't or that was wrongly placed on you. But on the other hand, if it's all up to the jury to decide, well, do we really think it was necessary and they could make that decision without looking at the burden of proof, but let's know that they made the decision without looking at the burden of proof or if they looked at the burden of proof and said, well, plaintiff had the burden, he didn't care. Well, I think that's exactly the problem we have here. There is no way to determine what this jury did. It was in the nature of, it wasn't a general verdict, it was very close to it, that there were, there was testimony of 50, 75 different tasks, maybe. Talk about the being able to run and climb the ladder and run up and take a look at the tanks. Did the plaintiff put on evidence and said, look, that's not necessary that the operator do that because there will be somebody else there, even though there were times there wasn't anybody else there to do it. There was testimony to that effect and Mr. Kramer was very good at scheduling. That's how he did his job. So he testified that there were, and all we're talking about is a five hour period on, I think a Sunday night, 12 to 5 a.m., that there was an ability to go up and test the tank at 12 o'clock, at 5 o'clock, that that could be done beforehand. He also testified that it was carte blanche for that head operator to call in terminal operators any time it was in the head operator's mind it was necessary on overtime. But on that five hours, the paraplegic could not do it, the plaintiff couldn't do it. Was his testimony, well, it just wouldn't be done during that five hours? The testimony was it didn't need to be done during that five hours because it could be scheduled beforehand when a terminal operator was there. But he occurred in the five hours and there was nobody to do it. Well, the emergency is not going up and testing the tanks. The emergency is, let's say it's a spill on the river or some other situation. The testimony was that Mr. Kramer as the head operator worked as incident command until others got there to deal with it, to go down and put the boom around the spill in the river or to deal with things. That the head operator's position then as incident command in an emergency situation was to notify the various agencies and get people there to take care of it, even during those times when there were head operators or terminal operators on ship. A head operator does not go running off into, in particular on this five hour period when nobody else is there, he doesn't go running off, paraplegic or not, running or wheeling into a situation where he's going to find, he's going to be the casualty, he's going to be dead when they get there. He's got to wait until somebody gets there to take some action. It's just plain idiotic and unsafe and not consistent with the company's own procedures to put that individual, able-bodied or not, in those situations. He doesn't run out and help if there's an emergency? To help, he's the incident command. He calls people in. He calls and notifies the agency. He may go out there. Somebody calls me in for an emergency at two in the morning and probably I'm not there at 201. There's got to be a little bit of a time lag. Right. And if he's the only person there, he's certainly not going to go. He's there and watches the emergency? He calls in the various people. He's not going to go out there. I keep thinking, what keeps going through my head in this case is frankly the Exxon Valdez case where the jury tagged the company with five billion in punitives basically for not firing a disabled man. Alcoholism is considered a disability. That was the theory. They should have gotten rid of him. I guess he'd fallen off the wagon. Well, why shouldn't the company here be able, considering the danger of these fuels, to be as prepared, commensurate with that level of danger as it would take, having an able-bodied man who could fill in during an emergency? Well, the problem is that there was not a case adequately made that it made a difference whether Mr. Kramer was there wheeling out these situations that were identified as emergencies or that there was somebody running out. In fact, he testified that he, in his wheelchair, had been out to the terminal farm, taking him out there with our expert, and that he was able to access all the different places. He wheeled through the gravel. He wheeled up the berm that was there. He was able to access it. What about the escape route in case of an emergency in the control center? That's the one where he would have to climb over a fence? That was what they tried to say might be necessary. Mr. Kramer testified that when he was out there, he saw razor wire over the top of these fences. So able-bodied or not, you don't jump up there and climb through this razor wire. You've got to go out where he would go out. How are you going to get out, the question was asked to him. He says, push and push harder. Is his wheelchair motorized? No. He's not in the courtroom. He thought he might be. But he's a strapping 20-something-year-old individual, very muscular. During the trial, we showed the kind of wheelchair that was designed specifically for rough terrain. He was as capable, probably more so, had he been permitted to go back on the job, in getting out to certain locations. They used bicycles for the able-bodied people. So he's got two wheels instead of one wheel, and uses his arms to get out there instead of his legs to push out. The problem with the essential functions, though, is that we just, we had, they shotgunned it. They said, this is what people did without accommodation in the routine they wanted to use. And we had all these things that we had to kind of try back. We don't know what the jury then, because we didn't have the essential function burden that we could then argue to the jury about what they proved or not. Is the fact that there's nobody else there between midnight and 5 a.m.? It is a fact that, under the current scheduling, that that's the case, typically. Your client would need to be scheduled during the day? My client needed a transitional period where he could go back, and the doctor testified that this was going to be a rapid transition, and I believe it was about a month, where he needed to get in a routine so that he could then go into a rotating schedule, and that he could then go into a rotating schedule. So the argument, of course, was that's a reasonable accommodation to let him get into the schedule and then go into a rotating schedule like everybody else was. I would reserve the remainder of, actually, let me point a couple other things, if I might, before I do that. There are other issues that we've raised in this appeal, and they all really go back to this particular same thing here. The refusing to instruct on the interactive process, that really goes hand-in-hand on what are the essential functions. We recognize it's not an individual claim. There's no liability for failing to engage in the interactive process. In this case, the evidence was pretty clear. We saw that it was a complete sham. They had the agenda ready to go, at the end of which they said, we can't help you. But the problem was there. Add that to the inability for them to come up with what are essential functions, and the jury should have been allowed to see that they made no effort to identify either essential functions or interactive process for reasonable accommodation. The witness coercion issue is a matter of protecting the process. Everything you have in the briefs is fully preserved. So if you want to save time for rebuttal, you don't have to repeat the things. I will do that. The only other thing is the testimony of Mr. Kennedy. You look at the ADA and the preamble about various biases in the society about people with disabilities. His testimony was important to show that a person with a disability such as our client, in fact a little more severe, had the ability to hold an important position and a dangerous position. There might have been differences which go to weight, but there were very similarities as well. And I will reserve the remainder. Thank you. Thank you, counsel. May it please the Court. Tim Volper for the FLE. The notion that this was a sham, a scattershot in terms of what the essential functions of the job are is simply untrue. There was a tremendous amount of evidence at trial as to what the essential functions were, and we've outlined that in a brief. There was the job description. There was testimony from the supervisor of the facility. Did the testimony go into why it was essential? Oh, yes. Oh, no, no. Oh, in great detail. And then we brought in the current head operator and two former head operators, who all came in and testified in detail, and we outlined that in our brief both in the statement of facts and in the section of the argument where we talk about error being harmless. But you didn't assert a defense of business necessity, although you're saying the evidence established it. I think that's what you're saying. You see, that's where what you have to understand is that the business necessity defense does not arise in this context. If you look at the statute, you know, there is subsection 5, which describes the type of discrimination which was alleged here where an individual was assessed by the employer and was not able to meet the essential functions of the job. That's section 5. Section 6 is the one that Judge Kleinfeld was talking about, which says we have a qualification standard, an overall qualification standard, and if you don't meet a certain test, you need not apply. We're not going to bother assessing you individually, okay, which is deemed by the courts to be much more extreme. Okay, now, if you look at the language of subsection 6, it requires the employer to prove the business necessity defense. So, the business necessity defense naturally arises under a subsection 6 provision where you're talking about standards, qualification standards. The business necessity defense doesn't apply here. And so, had we raised it, it would have been subject to being stricken. That's not an issue in this case. But you're not saying that you could say people have to work 12-hour shifts. That's our requirement. And if you can't work the 12-hour shift, then you can't have this job because it's a business necessity that we work 12-hour shifts. Isn't that your defense? No, we don't have that defense. The fact of the matter is— But you can't just say we have a 12-hour rule. Well, we can. We don't need it. I think we can, Your Honor, because one thing that's fundamental under the ADA is that the employer is not required to change the requirements of the job. Now, in order to show why this paraplegic could not be alone in this huge petroleum facility with 50,000, 50 million gallons of petroleum, we needed to explain to the jury, which we did, why we originally established this 12-hour shift. Didn't have to, huh? Explain why it was necessary? Not as a defense. But we did have to explain it in the context of showing the jury why it was that the head operators were alone during certain periods of time. Okay, so I'm not sure. I mean, you look at yourself, so I'm not sure I'm answering your question. You're telling me it all got before the jury, whether you are calling it a business necessity or not. I don't know. I understand what you're saying about there being some similarities between what we prove in a Section 5 case and the business necessity defense. But I think it's very important to understand Bates to recognize that that's an entirely separate defense. And remember, when we are outlining what the provisions of the job are, okay, we don't have to show that every single provision of every single job or a requirement of every single job is absolutely required and there's no conceivable way to do it otherwise. That would require the employer change the position or the requirements of the job in order to accommodate. And it's just crystal clear in the law that that is not required. But if you had your requirements that you had to fill out forms in blue ink and the plaintiff said, well, I can't use blue. It just gets me nervous and upset. I can fill them out in black, then that would be a reasonable accommodation, it seems to me, to make and you'd have to do it. Then there would be an argument to be made to the jury that that is not an essential function of the job. Counsel, I want to make sure I understand the difference between 5 and 6. Is this tried as a subsection 5 case and not a subsection 6? Yes, that's correct. Subsection 6 is using qualification standards, employment tests, or other selection criteria that tend to screen out an individual with a disability. Subsection 6 has to be shown to be job-related and also consistent with business necessity. Because you're arguing that because you didn't use a qualification standard or employment test or other selection criteria, it just wasn't tried as a subsection 6, and no one asked for it to be tried as a subsection 6. Right, right. Did the plaintiff ask for it to be tried under subsection 6? Absolutely not. There's no allegation made that there's some... Necessity doesn't come up. Right. Now, subsection 5 says not making reasonable accommodations to the physical limitations of an otherwise qualified individual with a disability who is an employee unless the business can demonstrate that the accommodation would impose an undue hardship. Right. That's how it was tried? Yes. And the jury... And there were questions about... I'm sorry. Now, was the jury asked about what accommodations might be made and what hardship might be imposed on the company? Yes. It was fully argued whether or not reasonable accommodations could be made to allow the performance of the job. I guess one accommodation is this guy should never do graveyard shift. He should only do daytime and day shift and swing shift so there are other people there. That was the argument. Basically, to understand this, the argument boiled down to, the plaintiff's argument was you should basically create a new position where there's always someone there with me in case of emergencies and I only stay in the control room. There is a day shift and swing shift, right? Yes. Do they have three or just two? I think it's just two shifts. Frankly, I can't remember how many shifts. We outlined that in our brief. I can't remember how many shifts. And are you claiming that the jury was properly instructed on subsection 5 or that any errors were not brought to the attention of the court or that it didn't matter? Now, that I don't understand. Oh, yes. We're claiming that the jury was properly instructed as to the burden, if that's what you're asking. The issue here is as to the burden of proving what the essential functions are. And the jury was properly instructed. That was an issue that has been established. Instructed in light of Bates? Oh, yes. Bates doesn't have anything to do with this case except it kind of helps explain the differences between a subsection 5 discrimination case, which this is, and a subsection 6 discrimination case. Bates is clearly a 6. And Bates goes to, and I can quote to the court if you'd like, Bates goes to great pains to explain that it is a 6, that 6 is a, they went and looked at the legislative history and they said it is a standalone provision. Basically, it is a unique provision. They also looked at the statutory language in between, the difference between 5 and 6. Well, at least they, I'm sorry, they focused on the statutory language with regard to 6. And what the court pointed out and said that this is essential, they said you notice in 6 they said we don't, it doesn't talk about a qualified individual with a disability. 6 talks about using qualification standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability. So the court was able to say, therefore, under these circumstances, the plaintiff does not need to meet, or does not have the burden necessarily to prove qualified individual with a disability, or what the, I'm sorry, what the qualifications of the job are. Now, you go back, you look at 5, and 5 is different in that crucial respect. 5 talks about both A and B, talk about qualified individuals with disabilities. And I just want the court to understand that Bates is very careful to say. First of all, it notes that UPS pointed out that many of our cases have stated in general terms that ADA plaintiffs bear the burden of establishing that they are qualified individuals with disabilities, listing a huge number of, a large number of cases, many of which we cited in our brief. And that says these cases, however, have for the most part been concerned, or no, have been, excuse me, have for the most part not concerned to a categorical qualification standard under Section 12.11.2.B.6. Can you tell me, getting back to 5, who has the burden of proving that the accommodation would impose an undue hardship? I know the plaintiff has to prove he's a qualified individual. The plaintiff has to prove he could do the job with an accommodation. Who has the burden of proving that the accommodation would be an undue hardship? I believe the defendant would have the burden. But you first have to prove, obviously, the important point here is that before you ever get to 5, you have to prove that they are a qualified individual with a disability. And they qualify because the statute, the general statute, says that you cannot discriminate against a qualified individual with a disability. And then you go to the definition of qualified individual with a disability, and that's where you get a person with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position. So the essential functions definition is a definition of qualified individual as to which the plaintiff bears the burden? Yes. The plaintiff has to prove that he can do the essential functions. And that means he has to prove what they are and he has to prove what they're not. And then, finally, I just want to point to the other, I think it's Bates at page 1086. The burden shifting, very carefully at the end, the burden shifting framework we apply today pertains to cases testing whether an employer may use a particular qualification standard, not to cases testing whether an employer may hire a particular individual. The usual statutory standards apply when an employer does not apply a categorical exclusion that precludes disabled persons from ever obtaining an individualized determination. Now, there's one thing that, there's an interesting footnote here that could confuse the court, but I think Bates teaches that it shouldn't. Oh, well, I shouldn't even go that far. Bates says that, this footnote says that there's a, this seems, is consistent with, what did they say? They say, our understanding of the party's burdens of proof in a case such as this one is consistent with that of the most similar case we have found, and they talk about the Monet case of the Sixth Circuit. And that's a case where the court did, in fact, I believe it's the only circuit, if I'm not mistaken, where the court did in fact decide that in a Section 5 case, the employer had the burden of proving what the essential functions are. But it's interesting to understand, I think the Bates case helps us understand where Monet went wrong. They say that it's very similar to this case, but in fact, Monet was a Subsection 5, you know, direct discrimination case. And what they did in Monet, though, and the reason the court found this very, like, you know, this court used the analysis from Monet, in Monet they just said, well, you know, the burden should be on the employer under Subsection 6. So, therefore, ipso facto, the burden should be on the employer under Subsection 5. And I think Bates is, therefore, helpful because it warns this court that it should not make the same mistake that the Monet court made. That is to say, it made very clear saying, the Bates case says, that the Subsection 6 qualification standards is a standalone provision, and it's for specific statutory reasons. And looking at the legislative history of 6, the burden is appropriately on the employer. But don't, as I said, don't confuse that with a Subsection 5 case. And so I would suggest to you that, if anything, Bates helps explain, warns against the mistake that the court made in Monet. Okay. Counsel, I'm looking at excerpts, page 112. I think that's where I'm supposed to look for the jury instructions. And I'm focusing on Section 5. Could you tell me where the jury was told that it's the employer's burden to show that whatever accommodation would work would be an unreasonable hardship? I don't know what they were, Your Honor. I think you said that Plaintiff's case was essentially that they should change the job around some so that he could perform it without having to be alone in the terminal. Yeah, he wanted a change in the job beyond an accommodation. Yeah. Change in the job is okay. Somebody's too short to reach a shelf that has to be reached. The employer has to give them a footstool. I think there's a case that says that's a reasonable accommodation. Yes, as long as they were accepting the job. So I guess here the question would be whether not giving them a day shift or an extra employee is going beyond a reasonable accommodation. And I think your concession was that it's the employer's burden of proof to show that the accommodation that would enable them to perform the job is not reasonable. You also have said the jury wasn't told that. No, I don't know that the jury wasn't told that. My answer to you is I don't know. You don't know what? Am I looking in the right place for the instructions? You're looking in the right yard. ER 112. I understand that my job here is for the instructions, right? And if they weren't, does it matter? So I want to look at them and know if they're right and whether if they're wrong. Well, the only instruction that's been challenged here is the burden of proof as to the essential functions. So one of the reasons I excuse myself for not knowing about the other instructions is that your focus here is on that preponderance of the evidence instruction and whether that's harmless error. And they haven't challenged any of the other instructions on this appeal. So I'd be glad to look this over and try to answer your question. So you think the appeal is limited to which language? Yeah, if you look at page 1 of their opening brief. I don't care about the briefs right now. I'm looking at the excerpts. I'm sorry. Okay. I want to know what language in the instructions to focus on and say this is okay, this is wrong. Well, I'm sorry. I'm confused by your question, Your Honor. I apologize for that. You're familiar with the instructions that were given to the jury in this case? Yes. I've focused, however. Yes. I've focused on the instructions. Show me where I can look and read the things. Oh, the instruction that was given? My guess is you have this all tabbed and highlighted and marked up. Well, frankly, Your Honor. It looks like it's an ER-112. Frankly, Your Honor. It's an ER-112. Yeah. And as I understand it, you're saying some words here are not on appeal, some are, and I want to circle which ones are and which ones are not. Okay. So you want to identify the exact instruction that's at issue here? I assume. Okay. At ER-112, the language is thus to establish the second element of his first claim. So you're talking 68 then, lines 15 through 19? Yes. Okay. And then suppose the jury thought, after they read that instruction, that the plaintiff had proved that he could perform the essential functions with a reasonable accommodation but not without one. With an accommodation, I should say, but not without one. The accommodation would be always have him on a shift where there are other people. How do they decide whether that's reasonable? How does a jury decide whether that's reasonable? There's an instruction that tells them how to decide and who has the burden of proof on what's reasonable. As to accommodation? Yeah. What we're talking about. I'm sorry, Your Honor. I cannot identify that particular instruction in the SER. If I take a moment during rebuttal, I'll try to find it for you, but I apologize. It looks like my time is probably up unless anyone has questions. Let me point to this one. Let me get one sentence out of my mouth on this. I asked the court with regard to the essential functions to pay attention to SER-47, which is a sworn statement made by the plaintiff to the Social Security Administration in which he outlines the essential functions of the job as being identical, virtually identical to what we suggested were the essential functions. Thank you. Thank you, counsel. Your Honor, let me start with SER-47. That question does not, that Mr. Kramer, who is now in the courtroom, by the way, does not address what are the essential functions. It addresses what the head operator and terminal operator did on an able-bodied basis without any kind of accommodation. That's what the question asks, and that's what the answer is. Mr. Kramer testified that he worked a lot of overtime outside of his normal head operator job as a terminal operator, and so that's the answer there. The idea of essential functions, if the employer does not have the burden, the idea of essential functions just plain goes away because all they have to do, as they did in this case, is say this is what this person, quote, has to do or this is what this person does. And what they did in this case, they had a video of an individual doing all the most difficult tasks, walking up the steps to test the tank, and that's all they have to do. If they don't have that burden, all they have to do is say, oh, he did this, he did that, he did this, and those, therefore, okay, plain, if you have to now show that you can do everything there with or without reasonable accommodation. It just vitiates the entire concept altogether. In our case, and as an example, our expert was not allowed to testify to essential functions. Number one, we couldn't get them, the defendant, to identify essential functions in pretrial discovery and that kind of thing. And so when our expert put everything together, he was unable to identify essential functions, and the court said, no, okay, now you can't even testify to essential functions. So our expert was prevented because, as a practical matter, we didn't have access to the information that would be able to show what the essential functions were. Counsel said that we were looking at, Mr. Kramer was looking to create a new different job, and he wasn't at the trial, so I can understand how he got to this, but that was never argued. Mr. Kramer argued that he could go in the control room, as he had done before as an able-bodied person, and by scheduling, which was his strength, scheduling the workflow, be able to do most of his job from the control room, but that he also could go out and do what an able-bodied person could do, albeit in slightly different ways, by rolling instead of riding the bicycle, by accomplishing things in different ways, which is the reasonable accommodation. But Manette, the idea there is that Manette, regardless of what Bates does, Manette says that the employers should have the burden of proof, and it goes through the reasoning for why, exactly what I'm talking about. It's just impractical and makes it – Would you respond to the argument I heard from Mr. Volper, that essential functions is defined as part of a qualified individual in D-5, and therefore is part of the plaintiff's burden of proof, and that Bates is not applicable? An argument could be made, a pretty strong one, that Bates does not address that, although it cites very favorably to Manette. And Manette does, in fact, say, under a Section 5 case – That being a Sixth Circuit case and not binding on the court here. Right. Not one that we've adopted. Well, we haven't adopted it. Bates sets it out and says, this is what we're going from. It was a Section 6 case. It was. This is a 5 case. Now, when I look at the statute, it looks like qualified individual, it looks like that is your burden of proof. There's none left that follows that, which would be the defendant's burden of proof. But essential functions is defined as part of qualified individual, which pretty clearly seems to be the plaintiff's burden of proof. What am I missing? Well, Manette is what you're missing. You know, they went through and looked at the practical aspect. It's just impossible for a plaintiff to go in without the information, without the ability to do the testing and come to the jury and say these are the essential functions. Right. My secretaries know more about their jobs, what the actual functions they do are, than I do. Somebody who is an employee very frequently knows much more about the details of the job than anyone in a high company office would. Why is it hard for the employee to show what are the essential functions? Because what we're dealing with at trial is the shotgun of this is all the things that they did. The employer's in possession of all the information about who has had the necessity to not do these things, where the records are to show that somebody has been off with a hand injury and therefore didn't do them. It's just they can come in and say everything. What my secretary does after I dictate reading notes or dictate conference notes and then send them back to her, I've got to ask her. What she does on a regular basis is one thing. What the essential functions are for that position is entirely different. And in a complicated position like the head operator position, that doesn't seem – I understand what you're saying, but it doesn't seem unreasonable to place that burden, as the statute appears to, on the plaintiff. I understand that the company may want to have some input in all of that, but if we place the burden on the company, we certainly would want to hear from the employees as to what they actually did and say, look, I know what the manual says, but that's not the way things have worked around here for the last 20 years. Here's what I do on a day-to-day basis. This is what we've always been expected to do. Sure. All the employer has to do is say, here are the essential functions. Here's my witnesses to say this is what's done, and this is how it's done. And so in that regard, as I look at SER 47, I'm wondering whether this really is as irrelevant as you suggest it is, because the question was, describe the job above that you did the longest. It would be as the head operator at the facility. And what did you do all day in this job? And the answer was loading ships with fuel, fuel tugboats, turning valves, climbing tanks. I can't tell if the next word is something safety committee, running to docks. Now, that's his response as to what I did all day. What I did all day is not what are the essential functions and how can they be done with accommodation. That question just doesn't address those questions, which are the key issues here in this case. He talked about what I did. Sure, I did all these things. And, in fact, because I was working overtime as a terminal operator, that's what he put down too. That's what he testified to, that he put down all these other, you know, just everything that he was doing because that's what the question asked,  Thank you, Your Honor. Thank you, Counsel. Kramer v. Pascoe is submitted.
judges: Thompson, Kleinfeld, Bybee